## Case No. 14,718.

### UNITED STATES v. CANOE.

[5 Hughes, 490.]

Circuit Court, D. Maryland. Nov. 22, 1867.

APPEAL—FINAL DECREE—WAR—PROHIBITION OF COMMERCIAL INTERCOURSE—SEIZURE OF GOLD COIN.

[1. Certain merchandise, together with some gold coin, was seized during a period of insurrection and libeled for condemnation, as about to be transported into the enemy's country. A decree was entered by which the merchandise was condemned and ordered to be sold. The court, in delivering its opinion, stated that the gold could not be condemned, and the decree directed that it should be deposited in the registry, to await further orders. Over two years later, on the petition of a claimant, the gold was ordered to be paid over to him. Held, that the original decree was not final in respect to the gold, and that, consequently, an appeal from the subsequent order might be taken, notwithstanding the fact that more than two years had elapsed since the date of the former decree.]

[2. The act of July 13, 1861, providing for the forfeiture of all "goods and chattels, wares and merchandise" coming from, or proceeding to, the insurrectionary districts, includes gold coin.]

[Appeal from the district court of the United States for the district of Maryland.]

CHASE, Circuit Justice. This cause comes before us on appeal from the district court. The libel charges that a canoe called the "Lapwing," with a lot of goods and chattels, consisting of two canvas sails, seven barrels of borax, and seven hundred and seventy dollars in gold, was, on or about the 20th of July, 1862, proceeding from parts of the United States not in insurrection to a part of Virginia which was in insurrection, and that the canoe and cargo including the gold, were seized by the proper officers for the violation of the act of July 13, 1861 [supra], and the act of May 20, 1862 [12 Stat. 404], prohibiting commercial intercourse between the loyal and rebel states, and thereupon the libel brought for condemnation. No claim was put in on the hearing below for any part of the property seized.

The first decree of the district court recites the facts proved. From this recital it appears that the canoe, with the borax on board, was found lying in a creek in St. Mary's county, in Maryland, and seized on behalf of the United States by a party of cavalry. No person was on board the canoe, but in the woods at a little distance, a man was captured who admitted that he was the owner of the canoe and cargo; that he was a physician residing in Virginia, and that he intended to take the borax to Virginia for sale. The gold was found upon his person. Upon these facts the district court expressed the opinion that all the property except the gold was liable to condemnation, but that the gold was not so liable, and thereupon at the March term, 1864, a decree was made condemning the canoe, the borax and the canvas sails, and directing that the gold be deposited in the registry to await further orders. The decree further di-

rected the sale of the property condemned and the deposit of the proceeds, after payment of costs, in the registry to await further orders. Subsequently in June, 1866, Daniel W. Vowles presented a petition claiming to be the person from whom the gold was taken, and praying an order that it should be paid over to him. The identity of the claimant was admitted, and an order was made for the payment of the money agreeably to his prayer. From this order the United States appealed.

The record does not exhibit the evidence upon which the district court acted, but counsel on both sides admit the correctness of the statement of facts made by the district judge. It is also admitted by the appellee, and this admission is the only evidence before us in addition to what was before the district court, that the gold seized upon his person, along with himself was proceeding to an insurrectionary state without a legal permit.

This is the case, and the first question arises upon a motion to dismiss the appeal on the ground that the decree at the March term, 1864, was final, and was not appealed from within the time allowed by law. If this be so, the present appeal must, without doubt, be dismissed. But was the decree of March term, 1864, a final decree as to the gold? It is true that the learned district judge in his opinion stated quite distinctly that in his judgment the gold could not be condemned. But the decree makes no final order concerning it. On the contrary its direction is that the gold be deposited in the registry to await final order. We cannot doubt that after this order it was quite competent for the district court, had the judge changed his opinion, to make an order condemning the gold and directing its payment into the national treasury either directly or after conversion into national currency by sale. There can be no final decree concerning a fund which remains in the custody of a court subject to further orders except one which terminates that custody. The only final decree in this case therefore relating to the gold was that made upon the petition of Vowles, and directing its payment to him. It is not questioned that the appeal from this final order was in time. The motion to dismiss must therefore be overruled.

This brings us to the merits of the controversy. The fifth section of the act for the collection of duties and for other purposes, approved July 13, 1861, prohibits all commercial intercourse between the citizens of states and parts of states in insurrection, and citizens of other parts of the United States, and provides that "all goods and chattels, wares and merchandise" "coming from" an insurgent state or "proceeding to" such state "by land or water" shall be "forfeited to the United States," unless protected by the license or permission provided for in the act. It is clear upon the evidence that the gold was "proceeding to" an insurgent state; indeed the fact is expressly admitted. The only question before us therefore is, do the words "goods and chattels, wares and merchandise" include gold coin? Now, nothing can be more certain than that in general these words do include money, whether of gold or of any other kind. Bouv. Law Dict. 224. The word "goods" has the same signification as the word "bona" in the civil law, under which name (Wheaton's Law Lexicon, 441) is comprehended almost every species of personal property. Tisdale v. Harris, 20 Pick. 13. It is true that according to some authorities money cannot be taken in execution upon a fieri facias against the goods and chattels of a judgment debtor; but the reason is, not that money is not included under the ordinary sense of the words "goods and chattels," but that it is not vendible. Lord Mansfield called this "a quaint reason" (Doug. 231), and it deserves a harder name. The contrary doctrine is expressly declared by the supreme court of the United States in Turner v. Kendall, 1 Cranch [5 U. S.] 133. There is, to be sure, a citation by Mr. Justice Story in Citizen's Bank v. Nantucket Steamboat Co. [Case No. 2,730], of a case from 1 Carr. & P. 310, to the effect that an indictment for embezzlement of money alleged to be the money of certain directors vested by statute "with all the goods, chattels, furniture, clothing, and debts" of the corporation was not sustained by proof that the money belonged to the corporation, for the reason that the words "goods and chattels" did not include money. But on referring to the book I do not find that the point was passed upon by the court. It was only made by counsel and reserved with other points by Baron Parke for decision by the twelve judges, and the case was finally adjudged (1 Moody, Crown Cas. 15) on one of the other points without the expression of any opinion on the question supposed by Judge Story to have been decided. It is possible that the learned judge did not examine the case. He cited it by a wrong name, Rex v. Burrell. That Mr. Justice Story did not himself adopt the doctrine that "goods" do not include money is apparent from the case of U. S. v. Moulton [Case No. 15,827]. In that case he held expressly that "personal goods" include not only coin but bank notes. The same doctrine was affirmed in U. S. v. Murray [Id. 15,842].

On the whole it seems clear upon authority and upon sound reason that the prohibition in the act of congress extended to coin. It were strange indeed, if an act, intended to prevent all unlicensed commercial intercourse between the loyal and the insurgent parts of the country permitted the unrestricted carrying of coin, the chief instrument of such commerce, to the latter from the former. No such construction of the act can be allowed unless required by clear words. And the mode of conveyance cannot affect the legal consequences of the fact. The most valuable goods are very often carried upon the person, es-

pecially when the object is to elude the vigilance of guards and officers, or to escape the consequences of being engaged in prohibited traffic. Daily experience during the late Civil War then illustrated and daily experience in the revenue service now illustrates the truth of this observation.

It has already been observed that it is part of the case here, not so clearly if at all established in the district court, that the gold coin in question was proceeding to a part of Virginia then in insurrection. A decree must therefore be made condemning it as forfeited to the United States.